```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   :     22cv1601 (DLC)
HYPER BICYCLES, INC.,              :     22cv3308 (DLC)
                                   :
                  Plaintiff,       :
           -v-                     :
                                   :     OPINION AND ORDER
ACCTEL, LTD. and TAPESH SINHA,     :
                                   :
                  Defendants.:
                                   :
-----------------------------------X
                                   :
ACCTEL, LTD.,                      :
                                   :
                  Plaintiff,       :
           -v-                     :
                                   :
HYPER BICYCLES, INC.,              :
                                   :
                  Defendant. :
-----------------------------------X
```

APPEARANCES:

For the plaintiff Hyper Bicycles, Inc.:
Thomas Hine LLP (NYC)
Renee Zaytsev
Riccardo Debari
335 Madison Avenue, Floor 12
New York, NY 10017

Ecoff Campaign & Tilles, LLP
Lawrence Ecoff
280 S. Beverly Drive, Suite 504
Beverly Hills, CA 90212

For the defendant Acctel Ltd.:
Gelber & Santillo PLLC
R. Zachary Gelber
Fern Mechlowitz
52 Duane St, 7th Floor
New York, NY 10007

DENISE COTE, District Judge:

Hyper Bicycles, Inc. ("Hyper") has brought an action to enforce a Settlement Agreement it entered with Acctel, Ltd. ("Acctel"). Acctel's separately filed action to enforce the parties' prior agreements and for a declaratory judgment holding the Settlement Agreement unenforceable was consolidated with Hyper's action. Discovery has occurred on some but not all of the issues that are at stake in this litigation. Hyper has now moved for partial summary judgment on five of the claims in its complaint and for dismissal of Acctel's complaint. For the following reasons, the motion is granted insofar as it requests summary judgment on two of its claims against Acctel and for dismissal of Acctel's complaint.

BACKGROUND

The following facts are undisputed or taken in the light most favoble to Acctel, unless otherwise indicated. Hyper designs and sells bicycles and children's ride-on toys. Acctel, a supply chain management and trading company, is incorporated in the British Virgin Islands but operates out of Taiwan. Among other things, Acctel assists companies with sourcing products from overseas manufacturers, including by using its own credit

to borrow money against product orders from the companies with which it works.

In June 2016, Hyper and Acctel entered into a set of agreements to facilitate a business relationship in which Acctel would provide trade credit and contract with third-parties to manufacture products for Hyper.  The parties executed three agreements: the Supply Agreement, the Warrant Agreement, and the Stock Purchase Agreement.

Under the Supply Agreement, Hyper would submit purchase orders to Acctel, and Acctel would "produce the quantity and types of Product as set forth in the relevant" purchase order; further, Acctel was required to source products from Walmart-qualified manufacturers at competitive prices.  The Supply Agreement further provided that a "mutually executed [Purchase Order] shall be deemed the invoice for the applicable order," and that "[a]ll payments shall be made by Hyper to Acctel in immediately available funds within 120 days after the date set forth on the bill of landing [sic]."  The Supply Agreement also provided that "Hyper shall comply with its payment obligations as set forth in this Agreement," and that "[a]ny failure to make a payment when due under this Agreement shall cause Hyper to incur a penalty of 1.0% of the amount overdue per month until such overdue amount is paid in full."

Under the Stock Purchase Agreement, Acctel purchased a 5% interest in Hyper for $275,000.  Finally, under the Warrant Agreement, Hyper granted Acctel a warrant to purchase up to 25% of Hyper's fully diluted stock for a purchase price determined in accordance with a formula set out in that agreement.  The Warrant Agreement also provided that Acctel's right to exercise the warrant would terminate on December 31, 2021.

I.   July–August 2021: Acctel Seeks to Exercise Warrant

Between 2016 and 2021, Acctel arranged for the overseas manufacture of products for Hyper and provided Hyper with credit terms; over this period, Acctel used its credit to purchase approximately $200 million of merchandise for Hyper to import and sell.  In early July 2021, "thanks to the growth of Hyper," Acctel sought to exercise its warrant, only to be met with radio silence.  For over a month, Acctel received no response to its repeated requests for information.  Internal emails among Hyper's CEO, Clay Goldsmid, and Hyper executives John Feeley and James Vallis show that Hyper was aware Acctel was trying to exercise its warrant.

Finally, after Acctel attorney Zachary Gelber sent a demand letter to Hyper, threatening suit if Hyper did not provide the requested information, Hyper responded with a one-paragraph letter from its own attorney, Lawrence Ecoff.  Ecoff wrote that

4

he was "looking into the matter."  A few weeks later, Ecoff sent
a second letter to Gelber, stating that Hyper had "concerns
about certain events relating to the Supply Agreement, and
particularly its relation to the Warrant[]."

Then, beginning on September 20, 2021, Hyper stopped paying
the money it owed to Acctel, that is, the money due based on the
invoices.  Goldsmid later admitted that he decided to stop
paying Acctel even though all the merchandise reflected in the
invoices had been shipped to Hyper and Hyper had sufficient cash
on hand to pay the outstanding invoices.  In the following days,
Acctel representatives (including Acctel CEO Tapesh Sinha) wrote
to Goldsmid notifying him of rising overdue payments.  Sinha
emailed, called, and texted Goldsmid about the mounting debt and
its impact on Acctel's ability to pay its own creditors.

II.  The Settlement Agreement

As Hyper continued to withhold payment on the invoices, the
parties began to discuss a way forward on September 25.  On
September 30, Acctel commenced suit against Hyper for breach of
the Warrant Agreement and unjust enrichment.  The parties
exchanged drafts of a proposed settlement agreement between
October 4 and October 18.  By October 15, Hyper owed $2,737,461
in overdue payments to Acctel for products already delivered to

Hyper.   Acctel's cash on hand was a fraction of what it had been before Hyper began withholding payment.

On October 18, 2021, the parties executed the Settlement Agreement.   Hyper agreed to pay the amount that was outstanding and overdue for products already shipped to it ($2,821,655.82), as well as the amount that would become due between October 18 and January 9, 2022 ($3,217,556.26).   The Settlement Agreement provided that the outstanding payments were to be received by Acctel within five business days of the Agreement's execution, and that there was no cure right as to those payments.   The latter payments were to be made on specified due dates, and if "Hyper default[ed] beyond any cure rights," Hyper would have no further rights under the Agreement.   For two of the payments ("the Kelin Payments"), Hyper's obligation to pay was made conditional on Acctel providing evidence that Acctel had paid Kelin, the subject manufacturer.

The Settlement Agreement also provided that Hyper would pay Acctel $750,000 in exchange for (1) Acctel's 5% of Hyper's stock and (2) Acctel's right, title, and interest in the Warrant Agreement for 25% of Hyper's stock; however, Hyper had the option to make a discounted one-time lump sum payment in the amount of $600,000 on February 1, 2022.   The Settlement Agreement provided that "All Stock Payments . . . shall be made

6

to Acctel . . . so as to be received by Acctel by the due dates"; however, the agreement included a 30-day cure right for Stock Payments.

The day after the parties executed the Settlement Agreement, Hyper sent and Acctel received payment for the outstanding invoices.  On December 3, Hyper paid Acctel the amounts due Kelin, even though Acctel had not sent Hyper proof if its payment to Kelin.  On December 15, Ecoff wrote to Acctel asking it to return the December 3 payment on the grounds that it had not received proof of Acctel's payment to Kelin.

On January 9, 2022, Hyper fully paid the last of the invoices due under the Settlement Agreement.  Hyper's October 19 payment had returned Acctel to a financial position equivalent to that it held before Hyper had withheld payment on the invoices.  And, Acctel's financial position remained stable through the remainder of 2021.

On January 25, Hyper informed Acctel that it intended to repurchase the stock under the discounted payment provision of the Settlement Agreement and requested that Acctel credit the December 3 payment related to Kelin towards the $600,000 discounted warrant payment.  On January 28, Ecoff sent another letter informing Acctel that Goldsmid had wired $211,021.26 to

7

Acctel, which "along with the sum of $388,978.74 previously delivered to Acctel, Ltd. [for the Kelin Payment], represents the full discounted purchase price for repayment of the Acctel Ltd. stock in Hyper, as well as termination of the Warrant."

On January 30, Gelber wrote a letter to Ecoff refusing to credit the December 3 payment on the Kelin invoices toward the warrant payment.  Gelber stated that "[i]f Hyper complies with the Settlement Agreement, including payment in full for the shares (without offset), Acctel will deliver its shares and terminate its Warrant[], as per the terms of the agreement." Gelber further stated that "Acctel would be willing to return the $211,021.26 wire (assuming the money is received by Acctel), if you provide notice of your intention and wire instructions on or before February 5, 2022."  Goldsmid wired the additional $388,978.74 on January 31, although it was not received by Acctel until February 7.

On February 17, 2022, Gelber sent Ecoff a letter repudiating the Settlement Agreement and requesting wire instructions for returning the $600,000 received on February 7. Hyper filed suit a week later.

III. Procedural History

On February 25, Hyper brought suit to enforce the
Settlement Agreement, and on April 22 Acctel brought suit to
enforce the Warrant Agreement and for declaratory judgment
holding the Settlement Agreement void as resulting from duress.
Hyper's complaint also alleged fraud (in connection with
Acctel's refusal to apply the Kelin Payment towards the
Discounted Stock Payment); breach of good faith and fair dealing
and unjust enrichment (for failure to return the December 3
Kelin Payment); conversion (for wrongful retention of the shares
and the Kelin Payment); and as well as breach of the Supply
Agreement and unfair competition (for allegedly misusing Hyper's
intellectual properly).   There is jurisdiction over both actions
pursuant to 28 U.S.C. § 1332.

The cases were consolidated, Acctel filed its First Amended
Complaint ("FAC"), and both parties filed motions to dismiss.
Hyper's motion to dismiss the FAC for failure to state a claim
was denied.  Hyper Bicycles, Inc. v. Acctel, Ltd., 2023 WL
2267041 at *3 n.2 (S.D.N.Y. Feb. 17, 2023).  Acctel's motion to
dismiss was granted as to Hyper's claim of conversion of shares
and otherwise denied.  Id. at *8.  Following a conference on
November 3, 2022, the parties were directed to proceed with
limited fact discovery addressed to Acctel's assertion that it

had entered into the Settlement Agreement under duress, and to thereafter file motions for summary judgment as to Acctel's duress defense and the enforceability of the Settlement Agreement only.  The parties' motions were fully submitted on August 11, 2023.

Hyper moves for partial summary judgment 1) declaring the Settlement Agreement enforceable; 2) on its claim that Acctel breached the Settlement Agreement; and 3) on its fourth, fifth, and sixth claims relating to Acctel's failure to return the Kelin Payment.  Acctel cross-moves for summary judgment 1) finding the Settlement Agreement unenforceable as a product of duress; 2) dismissing all counts in Hyper's complaint except the two counts relating to Acctel's alleged infringement of Hyper's intellectual property.  For the following reasons, Hyper's motion is granted in part, and Acctel's cross-motion is denied.


DISCUSSION

Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury

10

could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).  In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted).

The Settlement Agreement included a New York choice of law provision.  Under New York law, a contract entered into under duress is voidable, not void; a person claiming duress must thus "act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." VKK Corp. v. National Football League, 244 F.3d 114, 122 (2d Cir. 2001) (citation omitted); see also Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 133 (N.Y. 1971).  "A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing

under it, or affirmatively acknowledging it." VKK Corp., 244
F.3d at 123 (citation omitted).

Although a party "has no obligation to repudiate until the
duress has ceased," In re Guttenplan, 634 N.Y.S.2d 702, 703 (1st
Dep't 1995), where a party explicitly ratifies a contract after
any alleged duress has ended, that party will be deemed to have
forfeited its duress defense.  See Sosnoff v. Carter, 568
N.Y.S.2d 43, 47 (1st Dep't 1991); see also Restatement (Second)
of Contracts § 380(1) (Am. Law Inst. 1981) ("The power of a
party to avoid a contract for . . . duress . . . is lost if,
after the circumstances that made the contract voidable have
ceased to exist, he manifests to the other party his intention
to affirm it.").  This rule derives from the general principle
that a promise made after the cessation of the conditions
rendering an agreement voidable is binding.  See Wujin Nanxiashu
Secant Factory v. Ti-Well Intern. Corp., 788 N.Y.S.2d 78, 80
(1st Dep't 2005) (holding defendant had ratified a promissory
note by writing a letter promising to pay the debt about three
months after any duress had ended); see also Restatement Second
Contracts §85 ("[A] promise to perform all or part of an
antecedent contract of the promisor, previously voidable by him,
but not avoided prior to the making of the promise, is
binding").

Hyper argues that even if the Settlement Agreement was executed under duress, Acctel explicitly ratified the agreement at a time when it was no longer under duress.  It is correct.

Acctel has argued throughout this litigation that Hyper's refusal to make the invoice payments that were due as of October 15 -- and the threat of Hyper's nonpayment of invoices coming due on October 19 -- placed it under duress and compelled it to execute the October 18 Settlement Agreement.  Sinha testified that he was able to avoid defaulting on Acctel's own loans only by paying those loans using Acctel's cash reserves, and that those cash reserves were nearing depletion.

It is undisputed, however, that Hyper had fully repaid the invoices it owed Acctel by January 9, 2022.  It is also undisputed that Acctel's cash position had rebounded to pre-dispute levels by that date.  Therefore, the duress which Acctel identifies ended no later than January 9.  Indeed, Acctel's cash reserves had returned to pre-nonpayment levels by the end of October 2021, and remained at around that amount through the end of the year.  In other words, once Hyper paid the invoices, "the circumstances that made the contract voidable [had] ceased to exist."  Restatement (Second) Contracts § 380(1).  Three weeks later, in its letter of January 30, 2022, Acctel essentially ratified the Settlement Agreement.  Acctel wrote that "[i]f

13

Hyper complies with the Settlement Agreement, including payment in full for the shares (without offset), Acctel will deliver its shares and terminate its Warrant[], as per the terms of the agreement."

The January 30 letter thus "affirmatively acknowledge[ed]", VKK Corp., 669 F.3d at 123, the parties' respective obligations under the Settlement Agreement at a time when Acctel was no longer under duress.  Such an affirmative acknowledgment explicitly ratifies a voidable agreement.  See U.S. v. Twenty-Miljam-350 IED Jammers, 669 F.3d at 78, 91 (2d Cir. 2011) (holding that a party expressly ratified an agreement by sending an email two months after signing the agreement stating "I will honor what I signed").

Acctel argues that its January 30 letter did not ratify the Settlement Agreement but instead was sent to "express outrage" over the terms of the Settlement Agreement.  It is true that January 30 letter referred to the Settlement Agreement as "extortionate," but that accusation and Acctel's motives in sending the letter cannot overcome the plain language of Acctel's promise to deliver its shares and terminate its warrant "per the terms of the agreement."  Although "protests as to the conduct" of another party may offer "some evidence of [a party's] preservation of a claim of economic duress" where the

14

alleged ratification is implied through a party's conduct, Sosnoff, 568 N.Y.S.2d at 47, they cannot overcome the express terms of a promise made after any duress has ended.  Unlike in Sosnoff, where the defendant "detailed how the dire financial circumstances which compelled him to sign the note continued and alleged that he ceased payments on the note promptly at a point when he believed his other financial backers would not treat that action as a default on their obligations," id., Acctel has not offered evidence that it was still in trouble with its creditors as of January 30.  To the contrary, Sinha stated that the period of financial precarity "ended when we got paid back our -- our invoices."  See Wujin, 788 N.Y.S.2d at 80 (noting that party "testif[ied] that he was not under duress when he wrote the letter" promising to pay the contested Note).

The Settlement Agreement is thus enforceable.  Although it may have been the product of economic duress, Acctel ratified the agreement after any duress had ended.

As to breach, it is undisputed that Hyper made all payments due under the Settlement Agreement, including the $600,000 Discounted Stock Payment.  The Discounted Stock Payment was received by Acctel on February 7, 2022, well within the 30-day cure right provided by the Settlement Agreement.  Acctel does not dispute that it has not returned its Hyper stock or

15

acknowledged cancellation of its Warrant as required by the Settlement Agreement.

CONCLUSION

Hyper's April 28, 2023 motion for partial summary judgment is granted in part.  Judgment is entered for Hyper on counts I and II of its complaint.  Acctel's FAC is dismissed, its duress defense to Hyper's action is stricken, and its motion for partial summary judgment is denied.

Dated:     New York, New York
           October 4, 2023

                                    DENISE COTE
                              United States District Judge

16